We seek reversal of the lower court decision. The standard review is de novo. In preparation for today, I put together what I thought from the cases was the per se rule for the Dormant Commerce Clause. A per se violation of the Dormant Commerce Clause is a restriction of interstate trade, which benefits a private company, without a competitive bidding or alternative process. So that's based principally on Carboni, and then looking at the United Haulers, looking at the discussion of those cases in the Davis case, and then also the Lebanon Hills, the Third Circuit case. But fortunately, I'm not alone in interpreting those cases that way. In footnote 8 in the Davis case, which was not cited in the Red Long Quote, the 6-3 decision, including the concurring opinions, in so holding, we distinguished our decision in Carboni, which struck down a very similar ordinance on Commerce Clause grounds. The Carboni ordinance, however, benefited a private processing facility, and we found, quote, this difference constitutionally significant for the reasons adverted to in the main text. It's the United Haulers, end of quote. Although the Carboni dissent argued that the private facility was essentially a municipal facility, United Haulers relied on the apparent view of the Carboni majority that the facility was properly characterized as private. And then in the Scalia dissent, it quotes, as the Court explains, it be no small leap from invalidating state discrimination in favor of private entities to invalidating state discrimination in favor of the state's own subdivisions performing a traditional government function. The point of reading that was that we are not asking the Court to make that leap, because in this case, we have the two elements required for this Adornment Commerce Clause violation, and that is a restriction on interstate trade, and then we have a private party involved that's benefiting. So let's look at the purpose of the Per Se Rule for Commerce Clause cases, ensure a free market transnationally. Well, Counsel, let's go ahead and face the sort of the elephant in the room here. And here we have the mixed municipal solid waste going to a governmental entity rather than a private entity. Why isn't that dispositive as to the initial Commerce Clause analysis? Because the rule is, as I just stated, is interstate trade being banned, and it is, because the waste can't be hauled to Wisconsin. Two, is this a mixed motive case, where the trail of documents showing that Xcel Energy benefits from the transaction. In fact, Xcel Energy benefits in the sense they get paid $21 per ton for taking the refuse-derived fuel. That 20,000 tons, and then they take out the $2 they pay back to the city, that's $380,000 annually for five years. In the next few years, it's $570,000 annually, 30,000 tons, plus they get to sell the energy. Doesn't it matter, though, that you can't handle the fuel, that your clients can't process the fuel? Doesn't that mean that you're not similarly situated? Well, the Per Se Rule just requires two things, and that is a ban on interstate commerce, and then it was motivated by a private company. So the city was motivated by a company lobbying for this so they could make money. So what a simple Pro Se Bright Line Rule, that if the ban on interstate commerce, the city has entwined itself with a private company without competitive bidding, it's out. We do not want companies like Xcel, and other companies, lobbying local governments to restrict interstate commerce. That's a disaster. That's what I'd like to explore. You mentioned a mixed motive case. I don't think either Carboni or United Haulers had that. What case would you rely on for us being able to basically look beyond the fact that it's going to a governmental entity and eventually to a private entity? The Carboni case. Quote, discrimination against interstate commerce in favor of local business or investment is Per Se invalid. But there's a step in between in this case. Under the rule that I'm proposing, based on these cases, is that if there's a restriction on interstate commerce, and then a private company has benefited that without a competitive or alternative sort of process, then the Per Se invalid rule applies. So you're looking to the ultimate benefit rather than the fact that it's initially going to a governmental entity. Yeah. There was — it's either in Carboni or United Haulers, as I mentioned, that in these kind of situations, you look at the practical effects of the ordinances and agreements. It's not like you're looking to understand each provision. The practical effect here is, as I mentioned, hundreds of thousands of dollars of profit to Xcel, then my client loses 3,000 tons that he was taking from Goodyear County to Wisconsin at $66 tipping fees. So that's about $200,000 per year, and one-third of Pig's business. And all of this doesn't require them to be rivals? It doesn't require Xcel Energy to be a rival of the trash haulers? No. The test here in Carboni says that if it's a discrimination against interstate commerce, which everyone is undisputed we have, and then it says here that it is in favor of a local business or investment. So Carboni is saying discrimination against interstate commerce, that means the restriction, and then in favor of local business or investment, that refers to Xcel's arrangement here. And Xcel, by the way, was involved in all these processes. There's an agreement between the city and Xcel. There's a $2 million transfer to improve the Red Wing Solid Waste Campus. There's all sorts of evidence. That was all done in the context of changing Minnesota regulations that encourage municipalities and counties not to landfill their solid waste anymore, right? So I mean, that's not necessarily ominous that Xcel was involved in those negotiations, because the whole point of this is to burn that fuel rather than landfill the fuel. So if you didn't have anyone to burn it, why would you even go through all this regulatory process? Or am I misunderstanding the background? Well, the background is presented, but the point is, could they have a competitive bidding process? Could they have alternative processes? And your client could not have bid on that, right, because you don't burn the fuel. Well, I mean, under modern economics, people can capitalize and they can do things. And we do go through these steps of competitive bidding processes, even though apparently there's just one who would bid. It's very important, the form, and the opportunities here are cheap. That is, to put things out for a competitive bidding process. Here, Xcel and the city were wedded at the hip, were joined at the hip in this whole process where in Lebanon Farms, the Third Circuit case, there was an alternative process where the landfill out-of-state or in-state could apply to be a participant. There's none of these processes here. Suppose that competitive bidding ended up with Xcel winning. Wouldn't we still have that per se rule that you have? Because we would be benefiting an in-state company and there would be a restriction on interstate commerce. So under your rule, we'd have a dormant commerce violation, even with competitive bidding. Reading Carboni, yes. But reading my proposal, no. My proposal was that if the restriction benefited a private company without a competitive bidding process or other alternatives. See, the problem I'm having with it, and that's why I asked about the rival, and it gets to your client or some, you know, subsidiary or related company or some company you'd normally work with were burning trash, therefore you were a direct rival of Xcel, then I could see there being a dormant commerce problem. But you're not actually in competition and therefore I just, I'm having trouble, I'm having trouble with the fact that the dormant commerce clause cares about competitive bidding. What it cares about is rivals, favoring in-state rivals and discriminating against out-of-state companies. Well, I think the Third Circuit opinion cared very much about it because it talked about alternative processes that was offered by the government in that case to competitors. And so here you don't have that. And so if you don't have that, then it's just a private company arranging its affairs through the government regulation to benefit itself off a restriction on interstate trade. So, you know, the restriction on interstate trade is the ban on the haulers, my clients, picking up the garbage and bringing it to Wisconsin. So there is a restriction on interstate trade. I don't think anyone can deny that. It's undisputed. So then the question is, does the pro se rule apply when Xcel gets into this exclusive arrangement with the county and city, financing the agreement with a $2 million gift and then profiting at the expense of my client? Now, the expense of my client shows that they're standing, but the claim is shown substantively by identifying that Xcel benefited greatly from this arrangement that principally is a restriction on out-of-state trade and that it did so without a competitive bidding process. Mr. Carville, you're into your rebuttal, so you may save the rest of your time. Thank you. Thank you. Mr. Pieper, you may proceed. Good morning. May it please the Court, Andy Pieper, on behalf of the Goodyou County Respondents. The basic legal question on this appeal is whether the Dormant Commerce Clause renders unconstitutional Goodyou County's ordinance designating delivery of municipal waste to a publicly owned and operated facility. Based on the undisputed record and prevailing Supreme Court decisions, the answer is emphatically no, and this Court should affirm the district court's judgment. There's three primary reasons for this Court to reach that conclusion. First, the county's ordinance designates waste to be delivered to a public facility, which places the ordinance squarely within the constitutional framework established by the Supreme Court's United Haulers decision, which has been subsequently applied by both the Third Circuit and the Fourth Circuit. So, Counsel, to me that raises, I guess, the question, can an ordinance be designed to evade carboni simply by creating this intermediate governmental entity before it goes to the benefited private entity? I don't believe that there's an evasion of carboni here, Your Honor, in that just as in the United Haulers case, what is occurring here is that the waste is designated for delivery to a facility, and that facility isn't just a holding facility for the waste to then be moved to Excel. There is processing that goes into it. So we're talking about two different products here, and what Judge Strass was talking about earlier in terms of the similarly situated entities and the necessity for a competitive market to be applicable in a dormant commerce clause analysis is very much at play, where the resource I think you could certainly look at that in more than one way, however. You could also look at it that both of these are competitors who are in direct competition for solid municipal waste. One of them burns it and one buries it, but they're in the same market for the same product, and in fact, one of them is being displaced by the other. The distinction there, Your Honor, is that Excel is not in the market for solid waste. It is not burning solid waste. It is burning a byproduct. It is burning a processed form of solid waste that's called refuse-derived fuel. So what the resource recovery facility that's operated by the City of Red Wing does is it accepts the waste, solid waste, the raw material, if you will, to use the corn versus corn syrup analogy that the district court adopted. It is taking in the raw material, solid waste, and it is sorting that into recyclables, and it is processing that into refuse-derived fuel. There is a processing that goes through, and it creates a product called refuse-derived fuel. Refuse-derived fuel is distinct from solid waste. I do recognize that, although it seems odd to me that they're actually paying the city to take this waste off their hands. It's not as if it's a valuable fuel. The city is paying to have them take it. I also don't buy the corn, corn syrup analogy. It seems to me it's a lot closer to a situation. Let me ask this hypothetical. Suppose you had an ordinance that said all corn grown in this county must be delivered to a designated spot. Are you saying that an out-of-state ethanol plant would not be a competitor and would not have the ability to bring a Commerce Clause challenge? The problem with that, Your Honor, is that is the ethanol plant in your hypothetical processing? Is it accepting the raw material, the corn itself? Excel is not accepting the raw material. It's accepting the RDF. That's what it's accepting. To your question about is this valuable because Excel is paying for it, that's the case with any form of waste. That's the same thing when you transfer waste to a landfill. You pay for the landfill to accept it. So Pig doesn't have a landfill. It has a transfer station in Wisconsin, which does not do any processing. It sorts waste, and then it transfers waste to a landfill, and it pays the landfill to accept that waste. Here, what the public facility in Red Wing is doing is it's accepting waste within the county that's collected in the county, and it is processing that, and it is turning it into another product. And that product is only able to be used by facilities like the Waster Energy Plant in Red Wing that's operated by Excel, but then also by other plants that, as the record makes clear, the RDF may be transferred to, Olmstead County or Barron County in Wisconsin. So to Judge Strass' point, if there was a plaintiff to make a Dormant Commerce Clause case here, and we don't accept on other basis that it would be valid, but the proper plaintiff here, in order to even bring a Dormant Commerce Clause case, is an actual competitor of Excel Energy that is accepting RDF and using that to generate energy. The ordinance is also, I think we covered a couple of the points. One is on the public facility and how the fact that there's a public facility that's designated for delivery of waste here puts this within the United Haulers framework. And we've also discussed how appellants in this case are not similarly situated and do not compete with Excel, and therefore the Dormant Commerce Clause doesn't even have a role to play in this case from the beginning. The third point is that the ordinance is not per se discriminatory, and appellants discriminatory effects contentions fail because the ordinance treats similar in-state and out-of-state businesses the same and because it achieves legitimate local objectives that outweigh any alleged burden on interstate commerce. Counsel, if the ordinance is not facially discriminatory, do we still need to conduct a public benefit analysis? So the pike balancing test, Your Honor, so under United Haulers, the plurality would apply pike balancing test in that this follows the same framework that was found constitutional in United Haulers. It would likewise be found constitutional here. The reason I ask the question is it seems to me that the public benefit analysis in this case is quite different than in United Haulers. In that case, we had the public benefit was public health and safety. Here, I think if you if an honest analysis would say what's really going on here is that they're avoiding liability for closed landfills. Is that a public benefit for purposes of the pike test? So there are, as we noted in our briefing and as evident in the record, the entry of the Bench Street landfill into the closed landfill program was one motivating factor here, and that does have public health and safety implications, that policy goal in and of itself, because as is evident in the record, the Bench Street landfill, which is unlined and which the county has ongoing responsibility for environmental remediation of, by entry of that landfill into the closed landfill program, there is an entity in the state that can come in that has the resources to actually perform the cleanup of that landfill, which does have significant environmental hazards that it is posing right now. In addition to that, though, an ancillary goal here was to follow the guidelines set forth by the state in the Waste Management Act so that the county's waste management practices were in keeping with the policy objectives of the state and consequently achieving public health and safety goals. So a secondary reason for asking that question is to explore whether we need to remand to the district court for a pike analysis, because do we need to know whether it's a public benefit to burn this rather than bury it? No, Your Honor, because all of that analysis is already set forth in the record. The county has submitted... Well, the federal court doesn't have to accept the State of Illinois's reasoning for what's a public benefit. You mean the Goodhue County? I'm sorry, the State of Minnesota's. The policy reason is behind the closed landfill program. Well, so I would agree with that, Your Honor, but for the fact that there was no request for that type of discovery in this case. In other words, the way that this was set up from the get-go is that plaintiffs filed their complaint and both sides agreed, hey, let's present this issue to the district court on summary judgment and accept whatever record is put forth to the district court. And so to that end, Your Honor, I don't believe that there's any remand that is necessary here in order for the district court to perform the pike balancing test, because given the record that's already been established and given the case, this case, again, falls squarely within that. And I recognize my time is running short. I want to reserve time for counsel for this city. So unless there are any further questions, I would just urge the court to affirm the district court's judgment. Thank you. Roberts. Thank you. Mr. Baker, you have five minutes. Thank you, Your Honor. May it please the Court. I'm John Baker of Green-Espol, and along with my partner, Catherine Swenson, we represent the City of Red Wing. Judge Grass, let me go to your questions about pike, because it's important to remember that this case was decided on summary judgment. And when a non-movement appeals, this Court is limited by what that non-movement did or did not do in response to the moment, the motion. With regard to pike, it was all rhetoric, no evidence. They failed to carry their burden. And since 1987, that seals their fate on that. They didn't even address the public benefit side of the equation. They treated that as if it was something that no plaintiff has to address. And so they have left this Court no choice on that point but to affirm the grant of summary judgment. Did the district court need to conduct that analysis based on the record before it? It did conduct that analysis, and its holding is correct, given the limitations there. Even though pike has never resulted in a decision being overturned by the Supreme Court since 1988 and is increasingly disfavored by what the Supreme Court said under these circumstances, cabined by what the Court said in United Haulers and based upon the defaults and the forfeitures by the plaintiffs below, this Court has no choice but to affirm on that. What's most striking about the plaintiff's attack on this decision in United Haulers and seize upon any excuse to disregard the Supreme Court's holding and its reasoning, there have been times where the U.S. Supreme Court has cabined the scope of one of its precedents to the precise facts. There, United Haulers isn't one of those cases. Kentucky v. Davis shows that. And despite the new reliance by the plaintiff on footnote aid of Davis, he's ignored the way the sentence he quotes ends. For the reasons averted to in the main text, we relied upon the reasons averted to in the main text, and that's why our reading of Davis is governing. They have to convince the Court that the difference has constitutional significance and, for that reason, requires the opposite result. They haven't done that, so the Court has to affirm Judge Jody's decision below. Although we urge the Court to uphold the county's ordinance for multiple independent reasons, plaintiffs have had no business naming Red Wing as a defendant. They waited until the reply brief on appeal to offer any argument against two freestanding grounds for the city's motion for summary judgment. That's too little, too late. But even if the Court considers the untimely arguments in the reply, the city is still entitled to summary judgment. And with regard to, you know, the summary judgment aspect of this, it's not enough to wait until oral argument and then say to the Court, we have a trail of documents. It's not enough to wait until oral argument before the Court and call it for the first time a mixed motive case. I must admire the audacity of my friend in articulating a gloss on a number of cases that can't be found in any of the decisions he had cited and represent to the Court that it's not only a rule, but a per se rule. That's the subject of an interesting law review article and nothing more. First, Red Wing, which is a public body that adopted the challenged ordinance, did not subject plaintiffs to a violation of their constitutional rights. It entered into a contract with a county. It entered into a contract with NSB, known as XL Energy. It increased the fee the haulers paid. None of those things, to quote the text of Section 1983, subjected plaintiffs or caused plaintiffs to be subjected to a violation of their constitutional rights. And even if you don't agree with that analysis, we had argued in our opening brief below that Red Wing's protected from the Dormant Commerce Clause liability by the market participant doctrine. In their briefs below, they did not dispute the city's invocation of that exception. They only disputed the county's. So even if the Court excuses that forfeiture as well, their brief on appeal gives this Court nothing to work with. They cited no helpful market participant exception. They cited no evidence suggesting the city falls outside of the exception. So unless the Court has further questions, I'd encourage the Court to affirm the judgment below. Thank you. Roberts. Thank you, Mr. Baker. Mr. Carl. My friend representing the city of Red Wing proposed that somehow I was proposing a new test, but as I read in the Carboni decision, discrimination against interstate commerce in favor of local business or investment is per se invalid. And then my friend uses the word that that case was cabined, which contradicts the footnote eight that I read. And then I responded to Justice Ross's question, are you proposing something a little new? Oh, yes, it is a little new. But it's based on footnote eight in Carboni and my footnote one, the two-part test. One, is there a restriction on interstate trade? Two, does one company benefit from that restriction on interstate trade without a competitive bidding process or similar process? And so that's what I'm proposing. They're proposing that you generate all these documents that come up with the same result, that then it satisfies United Haulers, not Carboni. So I was reading the purposes of the Interstate Commerce Clause, Dormant Commerce Clause. One of them was promoting interstate trade. So do we want companies gaming local governments to profit off restricting interstate trade? Or do we want to deter companies from doing that by having a right-line rules? And these two questions, a court can handle this. A court can look to see if there's a restriction on interstate trade. Here there's a ban on hauling garbage out of the county. Then the court can handle this. Does one company benefit from this restriction on interstate trade without a competitive bidding or similar process? United Haulers, for the recyclables, there was a bidding process. In Lebanon Farms, there were alternative processes so other landfills could apply to receive the waste from that county. Now, we know that the pike balancing test has been criticized. It is very difficult for a court to weigh costs and benefits of a restriction. It involves market analysis. It involves all sorts of things. So what I'm proposing, based on Carboni, Footnote 8 and Davis, is that the test should be a simple one that the court can apply. Is there a restriction on interstate trade? Does one company benefit from this restriction on interstate trade without a competitive bidding or similar process? It seems that this case is a perfect vehicle for addressing that question. So the people in Goodyear County, the people in Red Wing, they want to know that those decisions made by their governments with respect to restricting interstate trade, which ultimately increased prices, is it being done with a pure motive? Or is that government entity wedded at that hip with a corporate entity who's trying to attempt to benefit from a restriction on interstate trade? I think this is the central point of the case. And a lot of this stuff that's being thrown at the appellants is really obfuscating the central issue. The central issue is what is the legal test? And the court teaches the law. So it's up to the court to teach us what the law is. And the benefit here of a bright-line per se rule is that in the future, Excel will know where to spend its lobbying money. Is it going to spend its money lobbying so it can profit off of restrictions on interstate trade? Or is it going to use its lobbying money in other, I would argue, constitutional ways? Thank you for your time.